ALLEN, Judge.
The defendant below, Archie McMillan, plead guilty to a charge of arson and burning with intent to defraud an insurer. The defendant was sentenced to prison in the State Prison for a term of two years.
The Judge of the Criminal Court, at the time of sentencing the defendant, included the following in his order:
“The Defendant in the above entitled cause having appeared before the Court on this date, having been duly arraigned, and having been advised by the Court of the nature and seriousness of the offenses charged against him, the Court inquired as to whether or not he had counsel or if he is without funds or means of employing counsel, would he wish to have the Court obtain the State Defender to represent him, and he answered in the negative. Whereupon, the Defendant being asked whether or not his plea was being made freely and voluntarily and without any inducements, offers of reward or otherwise made to obtain .a plea, did then and there freely and voluntarily plead guilty to the Information filed in said cause. Whereupon, the Defendant was asked by the Court if he had anything to say why the sentence of the law should not be passed upon him, and he offered nothing in bar thereto.”
The defendant, by and through his attorney, filed a petition to allow him to withdraw his piea of guilty, stating, in effect, that he was a Negro -man, about 50 years of age, had less than one year of formal education, could neither read nor write, except his name, and that he was serving time in the County Stockade of Polk County when he was carried to the County Jail and was questioned by two white men. He stated in his motion that he did not know the names of the men who questioned him concerning a fire in Lake Alfred, the property of Oliver and Clara Lee, his wife, but that the two white men promised the defendant that if he would tell them that he and Oliver Lee burned the building down and would plead guilty to burning it, they would see that he got probation and would give him $400.00 or $500.00 cash.
The defendant further stated in his motion that before he would do this, they cursed him and used all manner of oaths about him and Oliver Lee and he became so frightened and scared that he made the statement that he did burn the building down and that he would plead guilty.
He further stated that immediately thereafter he was carried before the judge, in his chambers, and there he stated he wanted to plead guilty and that he did not need a lawyer; he was not sentenced, nor referred for a pre-sentence investigation, but merely carried back to the Stockade. He stated he was not permitted to talk to an attorney or be advised of his right and that the statement that he made that he and Oliver Lee burned the building was false and was made because of his ignorance and the *70 threats made and his being scared of bodily harm.
His motion further sets forth that before he left the building where the jail is, to go before the judge, he was told to plead guilty, that he did not need an attorney, and that he would be looked after by the two white men.
On cross-examination of the defendant, after he had testified before the judge, the record shows the following:
“Q. Do you remember me asking you this question on that same date after you plead guilty in my office in there, I asked you this question : ‘Archie, how much schooling have you had?’ and you answered, ‘I went to the tenth grade.’ ?
“A. Had me scared up and I didn’t know what I was talking about, done scared me up, cussed me until I didn’t know what I was doing.
“Q, They weren’t in there with you?
“A. They had been with me that same day.
“Q, Do you remember you telling me about your arm being burned and you had to go to the doctor and he treated you?
“A. Yes, I went to the doctor.
“Q. Your arm was burned from the gasoline that flared out?
“A. No, sir, wasn’t any gas.
“Q. So these people offered you four or five hundred dollars if you would plead guilty?
"A. Yes, sir, that’s right, they were going to see me get out of this.
“Q. Who told you what doctor’s name for getting your hand burned?
“A. Ain’t nobody told me I went to the doctor myself.
“Q. Your arm and hand did get burned ?
“A. Yes, sir, they did get burned.
“Q. Wasn’t it from the fire?
“A. I went to help put the fire out and had on a short sleeve shirt and the fire got hot, I guess and blisters come on my arms.
“Q. And when you came in and pled guilty do you remember the Judge advising you what you were charged with and the consequences of pleading—
“A. Yes.
“Q. —pleading guilty. You had a right to have an attorney and the Public Defender would be appointed to represent you.
“A. Yes, sir, he told me that.
“Q. You remember that?
“A. They had me all scared up and I didn’t know what to say.
“Q. You said you didn’t want a Public Defender.
“A. They had me scared, I didn’t know what to say.
“THE COURT: Archie, I have known you a long time and you didn’t act scared.
“A. You didn’t cuss at me.
“Q. You were scared when you were before the Judge, and scared when you came in after you pled guilty and talked to me. There wasn’t any officer there.
“A. When I came in his office?
“Q. No, in my office.
“A. Done cussed and raised sand up there to I done got scared.
“Q. How do I know you aren’t scared now?
*71 “A. Ain’t nobody cussing me. No, sir, I ain’t scared.
“Q. Oliver ain’t got you scared?
“A. No, sir.”
The defendant pointed out Mr. John J. Savage and Mr. C. F. Dreves as the two men who threatened him and offered him $400 or $500.
Mr. Savage testified that he was with the National Board of Underwriters of the State of Florida, in the arson division. He was asked if the defendant had talked to him and he said:
“A. No, sir, not that date.
“Q. Did you at any time prior to that day threaten or promise him anything if he pled guilty?
"A. No, sir.
“Q. You were not even here the day he pled guilty?
“A. No, sir.
“Q. The day he came in and talked to me under oath you were not here that day?
“A. No, sir.
“Q. Do you know of your own knowledge whether Mr. Dreves was here?
“A. Only what he told me. I will find out.
“Q. Two weeks prior to that did you confer with this defendant?
“A. I don’t recall the exact date, but I had talked to him.
“Q. At that time did you curse him or threaten him or promise him any reward whatsoever for pleading guilty, or cooperating, or anything?
“A. No, sir.”
The judge then asked the witness Savage:
“Where did you talk to him, where was it?”
Mr. Savage answered:
“I talked to him at his home one shortly after the fire, and then once I talked to him at the stockade over here at Bartow.”
The questioning continued:
“Q. Did you ever talk to him here in this building? Did you ever have him brought in here and talk to him?
“A. I never talked—
“THE COURT: The other gentleman, was he with you on either occasion ?
“A. He was with me on both occasions.
“Q. But neither time did you have him brought in from the stockade and talk to him in this building?
“A. Not myself, I think he was brought in and Mr. Dreves talked to him. At least he told me.
“THE COURT: You didn’t?
“A. But I didn’t.
“THE COURT: The other gentleman was present when you talked to him at his home and at the stockade, but not here.
“A. That’s right.”
The witness Savage further testified, on cross-examination by the' defendant’s counsel, that the defendant, Archie McMillan, denied setting the fire and never admitted to him that he was involved directly or indirectly.
Mr. C. F. Dreves testified that he was a Deputy State Fire Marshall, that he had talked with Archie McMillan twice, and that he was present the day that the defendant came in and plead guilty. Mr.
*72 Dreves further stated that those who were with him that day were Special Agent Savage, the Deputy Sheriff Willis, Chief Deputy DeReus and Mr. Powell. Upon further questioning he testified:
“Q. That is the man [Powell] who gave him a lie detector test?
“A. Yes, sir.
“Q. He was given a lie detector test?
“A. Yes, sir.
“Q. It was after the lie detector test was given him that he admitted it all?
“A. Yes sir.
“Q. Told what he represented to be the truth?
“A. Yes, sir.
“Q. Did you come down with Mr. DeReus or .anyone the day he came and pled guilty before the Judge?
“A. No, sir, not before the Judge, no sir.
“Q. When you say pled guilty you mean you were here and others were here at the time he admitted it after taking the lie detector test he was guilty in Mr. Powell’s office in this building where Mr. Powell held the lie detector test.
“A. That’s right.
“THE COURT: Do you have any record to show what date it was?
“A. Yes, sir, we have the record.
“Q. Do you have it with you?
“A. September 18th at 10:25 A.M.
«* * *
"Q. Now, Mr. Dreves, you were present when after that lie detector test and he was asked a number of questions and he gave answers. That was in the afternoon of
September 18th, 1963, he signed that statement and you witnessed it.
“A. Yes, sir.
“Q. Was Archie McMillan at any time threatened or promised any reward for making that statement?
“A. Not in my presence, no, sir.
“Q. You are the man that is supposed to have cussed him and offered him some money. Did you do any of those things?
“A. No, sir, I did not. I have been in the game too long for something like that.
“Q. I believe those questions were being asked by Sgt. Willis and Eddie DeReus.
“A. Mr. Powell and myself witnessed his signature and he initialed it.
“Q. At no time did you see any threats made to Archie?
“A. No, sir.
“Q. Did he appear, at the time he made these statements, to be afraid?
“A. No, sir.
“Q. Scared?
“A. No, sir.”
Later the witness Dreves made the fol lowing statement:
“May I make a correction. In other words, you asked me who was present at the time this polygraph test was taken, but when he made the confession to Mr. Powell I said Mr. Savage was present. Mr. Savage was not in the office at that time. I’d like to make that correction.”
On cross-examination, Mr. Dreves testified:
“Q. Did anyone use any profanity toward him at that hearing?
*73 No. >
Did anyone offer him any money at that hearing? !0
No. 1>
Did anyone promise him probation at that hearing? <d
No, sir. i>
“Q. You say there was a complete recording of everything that transpired in the deputies’ office of everything asked him at that hearing?
“A. Well, all I can say is there was a young lady in there taking down all of the statement; that is all I can say.
“Q. You don’t know when it started?
“A. It started when he was talking to him.
“Q. All of that was taken down?
“A. That’s right.
“Q. And did you have any conversation with him yourself ?
“A. No, sir.
“Q. You didn’t talk to him at all?
“A. No, sir, not by myself.
“Q. While you were in there with Mr. Willis and Mr. Powell, did you talk?
“A. Yeah, I asked him a few questions, sure.
“Q. You don’t know how long you was in there before he admitted he was in it?
“A. No, I don’t remember.
“Q. Was it after he had the lie detector test?
“A. Oh, yeah, it was after the test because I wasn’t called in until he was given the test.
“Q. You were not called in until after i ... he was given the test ?
“A. That’s right.
“Q. Do you recall if he was warned of any of his rights ?
“A. He was warned, yes, sir.
“MR. LAIRD: That’s all.
“THE COURT: Let me ask you this-: Do you have any way to gain from a money stand point by his confessing?
“A. No, sir.
“THE COURT: You are on a salary?
“A. Yes, sir, I am on a salary.
“THE COURT: It’s a matter of pride to solve cases, I realize that, aside from that you didn’t get extra money?
“A. No, sir.
“THE COURT: There’s no way you could gain from a money stand point by the solving of this ?
“A. No, sir, no way whatever.
“THE COURT: Did you have a fund of hundreds of dollars to pay a man for confessing; the State doesn’t provide you with such a fund?
“A. No, sir, the State doesn’t work that way.
“MR. LAIRD:
“Q. If an insurance company saved several thousand . dollars they would be glad to pay out a few hundred ?
“A. Sir, I don’t work for an insurance company.
“Q. That would be true, wouldn’t it?
“A. I couldn’t answer that question because I do not work for an insurance company.”
*74 Again the defendant, Archie McMillan, after being recalled, testified:
“Q. That was on September 26th. Do you remember later my asking, ‘Archie, I am going to ask you this time — I want you to understand that now you have already pled guilty, but have you been promised anything that if you did plead guilty that you’d get anything?’ And you answered, ‘No, sir.’ Do you remember that? Do you remember my asking this question, ‘You realize you might be sent to the penitentiary for doing this ?’ And you answered, ‘Yes, sir. There ain’t no use telling a story.’ Do you remember telling me that?
“A. I remember saying that.
“Q. I asked, ‘Have you got anything against Oliver Lee?’ You said, ‘No, sir, not a thing.’ And then later I asked, ‘You can still tell me different. I am willing to listen. I just want the truth.’ And you answered, T am telling the truth. There is no use telling a story.’
“A. I said I didn’t burn it.”
The witness, Ray Willis, in answer to a question by the county solicitor, testified as follows:
“Q. You did hear Archie admit that he helped set the fire.
“A. Yes, sir. About his burns and all on his arm, how he got them, he was there; went into detail how it all happened.”
At the completion of the hearing, the judge entered the final order denying the motion to withdraw the plea of guilty, which set forth, in part, the following:
“The defendant’s Motion to Withdraw Plea of Guilty came on before the Court on this date for hearing; there being present the defendant and his attorney, Mr. D. C. Laird, and the Solicitor of this Court, Mr. Gordon MacCalla, whereupon the defendant took the stand as a witness in his own behalf and the State produced two witnesses, to-wit: Mr. C. F. Dreves, Deputy State Fire Marshall, and Mr. Jack Savage, Investigator for Underwriter’s Association; after carefully weighing all of the testimony submitted, the Court is of the opinion that the defendant did not sustain the allegations of his Motion by any competent and believable testimony; * *”
In the case of Adams v. State, Fla. 1955, 83 So.2d 273, the Supreme Court, in its-opinion, said:
“This court has consistently held that the granting or denying of a motion of this character is discretionary with the trial court and that the burden of proving an abuse of such discretion is upon the appellant. La Barbera v. State, Fla., 63 So.2d 654; Sinclair v. State, 133 Fla. 77, 182 So. 637; Collins v. State, Fla., 83 So.2d 6. Since the matter of credibility was in the hands of the trial court, and in the light of the admissions made by appellant in his own testimony, it does not appear that the burden has been sustained in this case.”
We conclude, as stated by the Supreme Court, that the credibility of the testimony before the lower court was in the hands of the trial court.
Under the authority of the above case,, the lower court is affirmed.
SMITH, C. J., and WARREN, LAMAR, Associate Judge, concur.